Filed 9/12/23  B.A. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| B.A. et al., | |
| Petitioners, | E080951 |
| v. | (Super.Ct.No. SWJ2200291) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Respondent; | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petitions for extraordinary writ.  Kelly L. Hansen, Judge.  Petitions denied.

Donna P. Chirco for Petitioner B.A.

James W. Tritt for Petitioner R.A.

No appearance for Respondent.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Prabhath Shettigar, Deputy County Counsel for Real Party in Interest.

Petitioners B.A. (Mother) and R.A. (Father; collectively, Parents) are the parents of C.A. (male, born 2018), and A.A. (female, born 2022; collectively, the children). Parents have filed petitions for extraordinary writ pursuant to California Rules of Court, rule 8.452. For the reasons set forth *post*, we deny both writ petitions.

**FACTUAL AND PROCEDURAL HISTORY**

On June 28, 2022, the Riverside County Department of Public Social Services (the Department) filed section 300 petitions on behalf of three-year-old C.A. and two-month-old A.A. The Department alleged that the children came within section 300, subdivisions (a), (b)(1), (e), and (j).

On the same date, the Department filed its detention report. In the report, a social worker reported that the Department received an immediate response referral with allegations of physical abuse and general neglect. On June 14, 2022, Parents noticed that A.A. "was 'twitching' and 'jolting.' " The next day, Mother took A.A. to Loma Linda Medical Center—Murrieta Emergency Room. The doctors diagnosed A.A. with "mild chronic jerking." A.A. "was discharged home and the mother was told to follow up with the child's pediatrician." On June 17, when Mother took A.A. to her pediatrician, the doctor observed that A.A. "was twitching on the right side of her body, which included her eye, arm and leg." The pediatrician told Mother to take A.A. to the emergency room immediately. Mother took A.A. to the emergency room where a CT scan revealed that A.A. had "a minimally displaced left parietal skull fracture and a complex right parietal

2

skull fracture with slight bleeding. She did not have any visible injuries and was described as alert and responsive." A.A. was admitted to the pediatric intensive care unit that same day. Mother stated that she did not know how the fractures could have occurred because she was "a stay-at-home mother and the father ha[d] been on paternity leave since [A.A.] was born." Mother indicated that the only other people who sometimes cared for the children were the maternal grandparents (MGPs).

The next day, on June 18, 2022, Parents told the social worker that the MGPs were caring for the children on June 14, 2022, when they noticed that A.A.'s wrist was "flickering." The MGPs took a video of A.A.'s wrist for Parents; Parents took A.A. to the hospital. Parents denied that anyone had dropped A.A. or had been rough with her. They denied having any criminal history, substance abuse issues, domestic violence in their relationship, or mental health concerns. Parents also denied using corporal punishment. Following the interview, the social worker went to the family home to complete a home assessment and to see C.A.; C.A. was found free of any visible bruises or injuries.

On the same day, law enforcement interviewed Parents and MGPs. Law enforcement did not suspect that MGPs caused the injuries to A.A. Parents provided identical statements to the investigator. They agreed to drug test and to submit to polygraphs. They also agreed to allow C.A. to remain with maternal relatives.

On June 20, 2022, Dr. Jacobson, a Loma Linda Forensic Pediatrician, told the social worker that A.A.'s injuries were "unique in the severity of findings." Dr. Jacobson stated that A.A. "suffered a hit to her brain and she has a complex left and right skull

3

fracture. The skull fracture on the right [had] multiple breaks. [¶] Dr. Jacobson further explained, [A.A.] suffered a hit to her brain and has a condition called Cystic Encephalomalacia in which the brain has cavities, cysts and hemorrhaging, and parts of her brain have died." Although it was difficult to date the injuries, the doctor stated it would be rare for A.A.'s injuries to have occurred at birth. Dr. Jacobson also stated that it was "also unknown if the injury was caused from one episode or if there have been ongoing episodes. However, the type of injuries that the child has are typically caused by blunt trauma."

The neurology department informed Parents that A.A. would have long-term development consequences that could include developmental delays and cerebral palsy. Moreover, the forensic team reported that A.A.'s "injuries are highly suspicious for physical abuse although she does not have other injuries."

On June 23, 2022, the Department obtained protective custody warrants and placed the children into protective custody. C.A. was placed with the paternal grandparents (PGPs) and A.A. remained in the hospital.

In the detention report, the social worked noted that on June 24, 2022, C.A. had a forensic examination and the results were pending. A.A. had a "PHN assessment" and was assessed "as medical fragile due to her need for further neurological observation and her being prescribed seizure medication."

At the detention hearing on June 29, 2022, the juvenile court found that a prima facie showing had been made and detained the children from Parents. The court ordered supervised visitation for Parents at a minimum of two hours twice a week.

4

On July 15, 2022, the juvenile court removed the children from the PGPs.[1]  A.A. was placed in a medically fragile resource family home, and C.A. was to be placed in foster care.

On July 18, 2022, the Department filed its jurisdiction and disposition report.  In the report, the Department asked the juvenile court to (1) find true the allegations in the petition; (2) deny reunification services to parents under section 361.5, subdivision (b)(6); (3) reduce parents' visitation to one time per month; and (4) set a section 366.26 hearing.

The social worker reported that she spoke with Detective Martinez of the Riverside County Sheriff's Department.  The detective "indicated there is an active and open law enforcement investigation regarding the non-accidental trauma suspected physical abuse of the infant, [A.A.]."  Although Parents continued to state that there was no plausible explanation for the injuries, "[t]hey have declined to complete the polygraphs and have obtained counsel regarding the criminal matter. . . .  The criminal case remains active and there is reason to believe at this time that the perpetrators that caused the injuries to [A.A.] are the parents."

The Department received a forensic medical examination report completed by Dr. Jacobson on July 13, 2022.  The social worker summarized the medical report findings: "1. Right complex, compound parietal skull fractures which are diastatic and extend to the sagittal, coronal and occipital sutures.  Left parietal skull fracture extending laterally

---

[1]  A.A. was placed with PGPs when she was released from the hospital on June 29, 2022.

5

from the sagittal suture with mild biparietal scalp swelling near the vertex. 2. Evolving intraparenchymal hemorrhages along the bilateral frontal and parietal cortex with probably cystic encephalomalacia. Additional small hemorrhages noted along bilateral cerebellum. Probable small foci of extra- axial hemorrhage along tentorium, bilateral frontal and right temporal lobes. 3. Normocytic Anemia."

The social worker summarized medical opinions: " '[A.A.] is a non-mobile infant who presents with head injury as evidenced by complex bilateral skull fractures, intraparenchymal hemorrhage with cystic encephalomalacia, hemorrhage along bilateral cerebellum, extra-axial hemorrhage along the tentorium, bilateral frontal, and right temporal lobe, and anemia which is caused by blunt force trauma to the head with acceleration- deceleration forces. There is no history of trauma being provided. At this time, these findings, in the absence of a major reported trauma, are most consistent with abusive head trauma. [A.A.] will need continual re-assessment to determine full prognosis and early intervention services'."

The social worker reported that A.A.'s seizure-like activity was first reported by the MGPs on June 14, 2022. A.A. was taking medication for seizures. Parents continued to deny any trauma to A.A.

On June 24, 2022, C.A. had a forensic examination. There were no physical findings related to abuse. However, prior physical abuse could neither be confirmed nor excluded. The Department reported that exposure "to violence, including abuse and neglect of a sibling, is asso[cia]ted with psychological harm to a child and constitutes neglect for [C.A.]."

Parents visited the children together with no reported concerns by the PGPs. On June 29, 2022, the Department provided Parents with referrals to "Core Services."

In the jurisdiction/disposition report, the Department requested that the juvenile court deny services to parents under section 361.5, subdivision (b)(6), because A.A. was a victim of severe physical abuse, Parents have no plausible explanations regarding how the injuries occurred, the forensic medical doctor stated that A.A. suffered a "hit to her brain," and A.A. had a complex left and right skull fracture. Moreover, "the type of injuries that the child has are typically caused by blunt trauma."

The social worker also noted that "[r]eunification services are not in the children's best interest," because A.A. "requires 24/7 supervision and protection from the parents" after sustaining "multiple head injuries and there is no indication by the treating doctors that this is due to a known medical condition."

In the jurisdiction/disposition report, the Department attached the "Suspected Child Physical Abuse and Neglect Examination" (CAN exam) for the children.

At the hearing on July 21, 2022, Parents requested a contested hearing.

The Department filed an addendum report on August 31, 2022. In this report, the social worker noted that a multidisciplinary team met on behalf of A.A. The social worker, a social services supervisor, Dr. Jacobson, a detective, and a deputy district attorney were present.

Dr. Jacobson informed the multidisciplinary team that she spoke with Father. He informed Dr. Jacobson that on June 12, 2022, the MGPs sent Father a video of A.A.'s hand twitching; the video lasted 15 minutes. Father denied seeing any twitching. Parents

7

picked A.A. up that evening and observed her. They saw no further twitching. On June 13, 2022, Parents noticed some twitching in A.A.'s right hand which extended to the right arm, chin, and eyebrow; it lasted 15 minutes. Parents called a nurse line and was advised to take A.A. to the emergency room; Father complied. The hospital discharged A.A. without taking any images of her. Later that day A.A. had another, shorter episode. Father told Dr. Jacobson that he thought A.A.'s condition was improving. On June 14, 2022, the twitching increased in frequency. When A.A. was seen by a pediatrician the following day, the doctor advised Parents to take A.A. to the emergency room.

Father denied any trauma or "any changes in behavior" for A.A: "No increase in fussiness, no lethargy, no change in the amount of formula intake, no vomiting, no marks, and no bruises." Father told the doctor that A.A. "appeared to be 'a little needier than he remembers their first child.' "

Father also reported social history information to Dr. Jacobson. Parents have been married since 2017. A.A. was in the NICU upon birth because she needed phototherapy due to her high bilirubin levels. A.A. was discharged on May 3, 2022, and a pediatrician followed up on May 5, 2022, for a well-child exam and jaundice. A.A. was in the hospital on May 5 and 6 for further phototherapy. A.A. was seen by her pediatrician on May 9 and 16, 2022. She was not seen by another provider until June 15, 2022, for the twitching episodes.

Dr. Jacobson next presented the medical findings, which included: "3D reconstruction of a head CT— Complex skull fracture, 'it's significant'. The skull fracture is on both the left and right side of the skull. (Attachment A). Brain findings:

8

[A.A.] had Evolving Intraparenchymal Hemorrhages. (Attachment B). The dark shaded areas are hemorrhages and/or evolving." According to the doctor, "this was 'more of the results of injury to the brain as oppose[d] to the initial insult'."

The doctor went on to present that the CT scan of A.A. facing forward showed "the hemorrhage and brain cavities called Probable Cystic Encephalomalacia. This is the 'result of damage to the brain'[,]" and the MRI of the brain showed " 'extensive brain damage.' " According to Dr. Jacobson, "skull fractures are hard to date; they don' t heal like other bones of the body heal. She stated, 'looking at the brain findings help me know this was not super recent'." The doctor stated that "[a]lthough no exact date/time could be determined," " 'it very well may have been more than one thing and ongoing.' "

Dr. Jacobson stated that the "findings and absence of a major reported trauma are most consistent with abusive head trauma." She went on to state that "these injuries are not injuries that are sustained during birth. . . . [S]kull fractures are rare to occur during birth. . . . [W]hen they do occur, they are simple skull fractures, 'they are not anything near the complexity of [A.A.'s] skull[] fractures and there is often assistance (vacuum, forceps, etc.).' " The doctor noted that A.A. had good Apgar scores that let her know that the child "came out looking well and both parents denied assistance was needed."

"On the repeat skeletal survey (completed on July 18, 2022, at Loma Linda Children' s Hospital in Loma Linda), the skull fractures (right and left) were present but no other fractures were seen. Per Dr. Jacobson, the seizures are a result of the injury but its 'hard to say if it was one impact, multiple impacts, one impact and shaking[.]'" The doctor stated, " 'we know we have blunt force trauma because we have skull fractures.'

9

[And, f]urther, in that process 'there was acceleration, deceleration of the brain and the skull which cause[d] the bleeding.' The seizures and low hemoglobin are consequences of the injury. [A.A.] did not have any indication of any other bleeding ongoing." The doctor stated that although babies are resilient, " 'when you damage the brain that does not come back.' " The doctor opined that the extensive damage to A.A.'s "brain could result in cerebral palsy or movement disorder, which will be most noticeable when [A.A.] starts growing and developing. [A.A.] is at high risk of having disabilities."

Law enforcement indicated that the investigation was ongoing but "they have evidence of what appears to be marital discord between the parents, frustration parenting, and some self-disclosures of potential injuries to the infant, [A.A.]." |

A.A.'s foster parent reported that A.A. did not track objects visually or with head rotation. A.A.'s pediatrician noted that A.A. did not smile responsively. A.A.'s medical records revealed no indication that A.A. had ongoing medical conditions that could have caused her recent injuries. A.A.'s delivery discharge reports indicated that she was discharged with jaundice, which required phototherapy anemia.

C.A.'s caregivers reported that he was shy and nonverbal. C.A., however, was comfortable with Parents, speaking openly and playing with them.

Both parents visited the children. Parents were happy to visit and consistent in attending. The maternal aunt reported that parents brought toys, art activities, and food for their visits with C.A., and were engaged throughout the visit.

The social worker reported that Parents started services with "SafeCare." By August 23, 2022, Parents completed one third of their services. Moreover, while in foster care, A.A. did not sustain additional injuries.

At the pretrial hearing on September 5, 2022, Mother's and Father's attorneys requested a continuance for discovery, which the court granted. The court, however, denied Mother's request for extended visits with C.A.

On October 14, 2022, the Department filed an addendum report. In the report, the social worker provided that on August 26, 2022, A.A. had a crania ultrasound. "The results were received and findings were, 'There is bilateral frontoparietal encephalomalacia with residual hemorrhagic products and fluid filled dilated cavities without communication with the lateral ventricles with mild mass effect on the bilateral lateral ventricles which are not enlarged. The 3rd ventricle is normal in appearance. The 4th ventricle is normal. The corpus callosum is intact. The visualized cerebellum appears 'normal.' Impressions were 'Encephalomalacia of the bilateral frontoparietal lobes with residual hemorrhagic products and fluid filled dilated cavities with mild mass effect on the non-enlarged bilateral lateral ventricles.' "

In October 2022, the Murrieta Police Department investigator reported that he sent his completed report to the district attorney's office for criminal charges to be filed for both parents, for child neglect and physical abuse.

At the continued pretrial hearing on October 19, 2022, counsel for parents requested a continuance to review subpoenaed records. The court continued the hearing

11

to December 6, 2022. The court denied the request for additional visitation and ordered sibling visitation two times per month for up to one hour.

On December 1, 2022, the Department filed an addendum report wherein the social worker reported that A.A. had ongoing episodes of crying and screaming. The neurologist believed this behavior may be episodes of "neurostorming," which can cause pain and discomfort. A.A. required constant nurturing and stimulation. She also required being held at all times or she would scream for long periods of time. The caregivers stated that A.A. was a very "high demand" baby."

On November 16, 2022, Dr. Pinchon, a neurologist, examined A.A. According to the doctor, "it is reported that [A.A.] wakes up numerous times during the night and will scream. She is inconsolable and will be given a bottle, but [she] usually does not take it. [A.A.] will also grab at her hair. The child sometimes has 'quick bilateral arm extension that happens randomly throughout the day.' . . . It was previously noted that [A.A.] has 'mild irritability consistent with post-traumatic encephalopathy.' "

The social worker reported that A.A. "had made some improvements to include, smiling and giggling. She does continue to have stiffness, but this has improved. [A.A.] eats well and has rolled over and grabs at items. She reportedly has head control during tummy time."

When C.A. was initially placed with his caregivers, he was selectively mute. He now speaks freely and bonded with his caregivers. The caregivers reported that C.A. was flourishing in their home, had adjusted well to his preschool, and appeared happy and social with other children. There were no reported behavioral concerns.

12

On November 14, 2022, the Riverside County District Attorney filed charges against Parents for the abuse inflicted on A.A. under Penal Code section 273a, subdivision (a), (felony willful child cruelty), with several enhancements. The warrant/arraignment hearing was set for December 2, 2022.

Parents continued to visit twice a week. C.A. had tantrums during the visits if he did not get what he wanted. After the visits, C.A. seemed to " 'shut down.' " He did not exhibit this type of behavior with his foster parents. The foster parents supervised A.A.'s visits with Parents at the Department's office. The interaction was appropriate. Although sibling visits occurred, the interaction between C.A. and A.A. was minimal.

Parents completed two parenting programs and an anger management program. Father was unable to attend individual counseling due to his work schedule.

On December 6, 2022, the juvenile court continued the pretrial hearing for a month to further investigate the allegations, subpoena records, and obtain letters from experts. The court also set the contested jurisdictional hearings.

On December 27, 2022, the Department filed a pretrial addendum report. In the report, the social worker provided that she visited A.A.'s foster home. She observed that A.A. "required the caregivers to hold her constantly and seemed soothed by this. When they walked away or went out of her sight, she would scream and cry, very inconsolable unless held." The social worker also noted that there was an EEG scheduled in January 2023 to assess the child's "startle" reflex. A.A.'s pediatric neurosurgeon reported that the child's injuries will cause cognitive deficits; the injury to her frontal lobes can cause deficits in attention, executive functioning, planning, and impulse control. The doctor,

13

however, noted that A.A. had made significant developmental progress with gross motor and other skills.

The addendum report stated that Parents continued to visit the children. At times, C.A. threw fits when the visits began and ended. Parents were arraigned in criminal court with a felony settlement conference date set for February 21, 2023.

On January 5, 2023, Mother filed a "neurology-pediatric report" prepared by Dr. Ronald Gabriel. In the report, Dr. Gabriel provided an analysis of the causation and timing of causation followed by a preliminary damage profile. Dr. Gabriel also reviewed the records regarding Mother's labor and delivery and A.A.'s medical records through August 17, 2022. Furthermore, Dr. Gabriel reviewed four videos, four still photos, and all imaging. Dr. Gabriel concluded that A.A.'s current condition was a result of severe mechanical traumatic brain injury due to severe crushing of her cranium during the delivery process, compounded by inappropriate handling of A.A. during cleansing in the delivery room.

In his report, Dr. Gabriel stated that although "not recorded in the delivery notes, but vividly demonstrated by a four-second video, there appeared to be both urgency and panic in delivering this child. The delivering physician applied what was undoubtedly tremendous manipulatory pressure on the baby's head with both hands and fingers . . . unquestionably resulted in a crushed skull bilaterally." He also stated that a second video taken in the delivery room revealed "rough handling by the nursing staff and at one point allowed the baby's head to fall without restraint and with gravity onto a thin mat with what appeared to be a bounce. This struck the right side of her cranium." Dr. Gabriel

14

went on to state that "Apgar scores reflect brain stem function and the superficial aspects of the cerebral hemispheres are neurologically silent at this age." The doctor noted that before the seizure on June 15, 2022, A.A. developed severe anemia as a consequence of intracranial hemorrhaging, complicated by an "ABO incompatibility,"[2] contributing to hemolytic anemia. This accounted for the severe jaundice, which was a consequence of both red blood cell breakdown from the ABO incompatibility and the breakdown from the major intracranial hemorrhaging that occurred following delivery.

Dr. Gabriel went on to state that the "initial CAT scan on admission, 06-17-22 is illuminating." The scan revealed "massive encephalomalacia, or cystic cavitation, of both frontal lobes and occipital lobes, which reflect pathology at least four to six weeks before the study was performed." The scan also revealed "multi-compartmental and multi-focal hemorrhaging of various ages, beginning with blood at least 10-14 days old to . . . at least four weeks in age." The doctor also noted that the fractures revealed a significant degree of healing. Therefore, Dr. Gabriel concluded that the initial CAT scan was compatible with and diagnostic for the events of April 29, 2022, the time of the delivery.

At the pretrial hearing on January 5, 2023, the juvenile court confirmed the trial date and granted Mother's request to allow Dr. Gabriel to testify remotely.

---

[2] "ABO incompatibility" is when, because of an incompatibility between the mother's and baby's blood, the baby's red blood cells are attacked in the womb by antibodies from the mother. (https://www.ncbi.nlm.nih.gov/books/NBK2266/ [as of September 8, 2023].)

15

At the contested jurisdictional hearing on February 6, 2023, the Department submitted on its reports and recommendations. Mother called social worker Stacey Vasquez to testify.

Vasquez testified that she had been assigned to this case since October 2022. She stated that although she had reviewed Dr. Gabriel's report, her recommendation did not change. She agreed with Dr. Jacobson's recommendations. Based on the statements made by the doctors that examined A.A., including Dr. Jacobson, Vasquez concluded that the skull fractures resulted from an intentional act, not a birth injury or negligence by hospital staff.

Vasquez went on to testify that A.A. was with her parents when she was injured. She believed that Mother or Father, or both of them, were involved in the abuse or aware of what occurred. Vasquez believed that Mother was also responsible for A.A.'s injuries. She recommended reducing visitation because Parents were not reunifying with the children. Moreover, C.A. had difficulty with visitations. She believed C.A. was very confused. Vasquez did not find visitation to be beneficial to either child even though Mother's visits generally went well.

On cross-examination, Vasquez testified that she had been a social worker for about 18 years. As to the placement of the children, Vasquez reported that C.A. was placed with a maternal cousin, and A.A. was placed in a medically fragile home. A.A.'s foster mother was a nurse. Vasquez stated that if the children were placed with MGPs they would not limit contact with Mother. She also stated that MGPs were willing to adopt the children. Vasquez testified that except for Dr. Gabriel's report, there was no

16

indication that A.A. suffered injuries at the time of her birth. Parents never informed anyone that A.A. suffered birth-related injuries.

Mother testified that when she was 23 weeks pregnant, she had medical complications with spontaneous bleeding. Mother stated that she had preeclampsia and high blood pressure during delivery. A.A. was born prematurely with her umbilical cord around her neck, and had ABO incompatibility and jaundice. After being hospitalized for four days, A.A. went home on May 3. However, just two days later, Parents returned to the hospital with A.A. due to her jaundice. A.A. was discharged the day after, on May 6, 2022. Between May 6 to June 4, 2022, Father, MGPs, and Mother cared for A.A.

MGPs cared for A.A. on three occasions, for as long as four hours. Mother took A.A. to the doctor for wellness and jaundice follow-up appointments for the first six weeks of A.A.'s life. MGPs noticed A.A. twitching for the first time on June 14, and Mother noticed it for the first time on June 15.[3]

Mother testified that she noticed A.A.'s wrist twisting on June 15, 2022. Father took A.A. to the emergency room and returned the same day. The doctor told Father that it was a typical development in a newborn. When they took A.A. for a follow-up appointment, the pediatrician was concerned that A.A. may have a neurologic issue. During the first six weeks, Mother stated that A.A. would sometimes cry almost every hour and wanted to be held.

---

[3] At this time, Mother's testimony was interrupted to allow for the testimony of Dr. Gabriel. After the doctor's testimony concluded, Mother continued her testimony.

Mother testified that she also had preeclampsia when she was delivering A.A., and she was born with jaundice. Mother testified that Father never hit her, threw anything in anger, and that she never threw anything at Father or hit him in anger. She admitted that they "screamed" at each other in texts. They argued about unequal parenting roles but they never used physical discipline on the children. She never hit A.A.'s head, and never saw anyone hit her.

On cross-examination, Mother testified that she remembered something going wrong at A.A.'s birth. She heard the doctor saying that she was "really small down there, and so she had to put her hands in there." At that time, the doctor noted that A.A.'s umbilical cord was wrapped about her neck.

A few hours after A.A.'s birth, a nurse took A.A. to the NICU because she had ABO incompatibility and jaundice. Mother did not see anyone mistreat A.A. Father told Mother that on June 17, 2022, Dr. Jacobson told Father that A.A.'s injuries could have been caused at birth.

During the time when A.A. was discharged on May 3, 2022, and the 42 days before A.A.'s seizure episode, Mother did not have any concerns that something went wrong at delivery. Mother expressed concerns that minor was sleepy, grunted, and had difficulty with feeding. Father asked the pediatrician about A.A.'s "fussiness and the grunting and her crying." Father was on paternity leave during this time. Parents took turns caring for A.A. at night. Although A.A. sucked very slowly and took a long time to feed, she was gaining weight. Mother said she did not injure A.A. in any way. Father was also a primary caretaker of A.A. during the time after discharge. He did not tell

18

Mother that he had hurt A.A., except for the time when he dropped a cell phone on A.A.'s cheek.

Mother's cross-examination continued on March 3, 2023. Mother testified that she never had concerns about Father's parenting skills. Parents texted about their marital issues and would swear at each other in texts. On multiple occasions, Mother asked Father for a divorce. She was disappointed in Father because "he would always say that we would talk about our issues, but it never was that, or that he would work on things, but it never happened." During the time from A.A.'s birth to June 15, 2022, Mother stated that she and Father were in a good place "for the most part" and always put their kids first. Mother did not tell law enforcement about Father dropping the phone on A.A.'s cheek.

Mother confirmed that Father dropped the phone on A.A.'s cheek on June 8, 2022. Mother did not show the picture of A.A.'s bruise to anyone.

On redirect examination, Mother testified that she printed out divorce papers but never filed them. In hindsight, she did not think it was a good idea to threaten Father with divorce. Mother talked to Father about their issues—such as why he felt she was not doing enough even though she was a full-time student and parenting the children.

On recross-examination, Mother testified that Father had been dishonest before. He lied to Mother for four years that his parents knew about Parents' marriage, which she believed to be a "pretty big thing to lie" about. Father lied about his religious background. Also his parents had not known that she was pregnant with C.A. Father

19

also told Mother that his parents did not attend their wedding because his mother did not like "windy roads."

When the trial court questioned Mother, she stated that A.A. saw a medical professional three or four times between May 3 and June 14, 2022. Moreover, before A.A. was discharged from the NICU, A.A. had to participate in a car seat test where she was placed in a car seat with monitors to determine how long she would be able to stay in her seat. The test lasted over 30 minutes; A.A. fell asleep during the test. While at the hospital, Mother fed A.A. by cupping her head in her arm, under her ears, while supporting her neck.

Mother's counsel called Dr. Gabriel to the stand. Although Mother's counsel requested that Dr. Gabriel be certified as an expert in pediatric neurology and neuroimaging. The court stated: "I won't certify him, but I'll designate him as an expert."

Dr. Gabriel testified that he was hired by Mother's counsel. He did not interview Parents or talk to any of the social workers. His opinion was based exclusively on the patient care records. A.A. demonstrated "a black and blue hip, forehead, and head. Also . . . vertex peaking." He testified that from two photographs at the time of delivery, he observed "peaking of the top of the head, which . . . represents molding and, under the circumstances, knowing everything else that I know, probably blood underneath the scalp producing that kind of contour." He also saw an abnormal positioning with fisting and a

clonic[4] neck reflex indicating neurological abnormalities. Dr. Gabriel stated that his experience led him to conclude a certain position of A.A.'s hand was an abnormal neurological issue. Moreover, A.A. developed abnormal elevated bilirubin-producing jaundice and hemolytic anemia due to ABO incompatibility. The doctor suspected that A.A. may have kernicterus (brain damage). Dr. Gabriel also saw that A.A. had skull fractures. He opined that the fractures occurred during birth and shortly thereafter. It "was a double-impact jeopardy. One was the manipulation by the obstetrical hands when the child was being delivered, what appears to an urgent, almost panic basis. . . . [¶] And then follow that, based upon video, allowing the baby's head to drop with gravity without restraint and what appears to be a bounce to the right side of the brain, the side of the complex fractures. The doctor went on to testify to the specifics of his findings.

On cross-examination, Dr. Gabriel testified that there was no evidence that A.A. suffered any other type of head trauma while Parents cared for her. He stated: "There's no way to measure and give you a number in terms of force gravity. But when you look at the four-second video, you'll see a tremendous amount of pressure exerted on the baby's head by the fingers and hands of the delivery doctor. It's a qualitative observation, not a quantitative observation." The doctor noted that A.A. did not suffer injuries to her neck even though the doctor's hand "vigorously manipulated the infant's head."

---

[4] "Rhythmical, large amplitude, relatively slow jerking of a portion of the body."

Dr. Gabriel went on to testify that a normal Apgar score is standard in cases like A.A.'s case. When asked if the Apgar score should have been affected after a child's "skull was just crushed," the doctor replied: "No, not necessarily." The doctor also stated that a child could suffer bilateral skull fractures and not show any symptoms for six to eight weeks.

Dr. Gabriel agreed with Dr. Jacobson's assessment that A.A.'s injury was caused by "blunt-force trauma" and an impact injury. He, however, disagreed that there was evidence of "acceleration/deceleration injury on [the] MRI. [¶] As a matter of fact, so much of the brain has been damaged, you really could not tell if there was any axonal disruption. This is not an acceleration/deceleration type of injury."

Dr. Gabriel reiterated that he was able to date A.A.'s skull fractures. He observed that the fractures were in an advanced healing process and did not think Parents could have caused the trauma. He stated that Loma Linda should not have discharged A.A. on May 3, 2022, and again on May 6, 2022, given her medical condition.

Dr. Gabriel admitted that he had not delivered a baby since 1971; he was not a specialist in labor and delivery; he did not know the rate of preeclampsia in pregnancies; or how often Pitocin is administered during delivery. He also stated that the labor and delivery notes did not indicate any sort of crushing of the skull or gravitational fall when A.A. was being cleaned. Moreover, Dr. Gabriel stated that jaundice is a common occurrence in newborns.

At the end of this cross-examination session by the children's counsel, Dr. Gabriel confirmed that he was able to date A.A.'s skull fracture to April 29, 2022, the day she was born.

During redirect examination, Dr. Gabriel testified that he dated the skull injuries to A.A. based on the two videos taken at birth, the imaging on June 17, 2022, and the photo of discoloration of the head. The videos and photographs were not part of the medical records.

When the court examined Dr. Gabriel, he testified that the last time he was present for the birth of a child was in a clinical setting in 1971, with a few exceptions, and the last time he delivered an infant was in 1964. He testified that A.A.'s head was "slammed" into the mat by force of gravity. He, however, did not see any descriptions of extensive bruising to A.A.'s scalp in the medical reports.

MGM testified. She stated that she wanted placement of the children, and was willing to accept the court's potential finding that one or both parents caused A.A.'s injuries, even if she did not believe that either parent could have caused any harm to A.A. After MGM's testimony, the court announced it was breaking for the weekend, to resume the following Monday, March 13, 2023.

On March 7, 2023, C.A.'s caregivers filed a caregiver information form. They reported that C.A. was thriving in the caregivers' home. On March 9, 2023, A.A.'s caregivers also filed a caregiver information sheet. The juvenile court, however, did not consider the form because Mother's counsel had not seen or read the document.

23

At the continued hearing on March 13, 2023, Dr. Jacobson testified as a rebuttal witness on behalf of the Department. The juvenile court deemed Dr. Jacobson a qualified expert in child abuse pediatrics.

Dr. Jacobson testified that her job entailed reviewing medical charts, gathering history, performing a physical exam, making recommendations on any diagnostic studies, interpreting diagnostic studies, and forming an opinion and making recommendations for the continued care of a patient. A.A.'s primary care team asked Dr. Jacobson to consult on A.A.'s case due to concerns for physical abuse and/or neglect. In A.A.'s case, other specialists were involved in her care, including the pediatric ICU team, neurology, neurosurgery, and ophthalmology.

Dr. Jacobson saw A.A. on June 18, 2022; the infant was seven weeks old. Dr. Jacobson reviewed Loma Linda's electronic health record, some pediatric primary care notes, and interviewed Father. The doctor did not interview Mother because she was not in the room with A.A. when Dr. Jacobson was there. The CT scan showed bilateral complex parietal skull fractures, and intracranially. Moreover, there were findings of hemorrhage or blood throughout, as well as cystic cavities concerning for encephalomalacia, which are holes in the brain where the brain has died. There were also multiple types of hemorrhage in A.A.'s brain. Furthermore, the MRI scans showed more detail about the actual injury to the brain itself. Encephalomalacia is the result of some traumatic insult to the brain.

Dr. Jacobson testified that she found A.A.'s injuries to be most consistent with significant abusive head trauma, as seen in rollover motor vehicle accidents where a child

24

is unrestrained. Father provided the doctor with no history of trauma or explanation for the infant's injuries. The doctor stated that the birthing process could not explain A.A.'s injuries. Dr. Jacobson did not tell anyone that A.A.'s injury could have possibly occurred at birth. She reviewed Dr. Gabriel's report and the four videos and photographs provided. Dr. Jacobson did not see anything unusual in the doctor's manipulation of A.A., the head, or the cord, that would lead to cause fractures in A.A.'s skull. Dr. Jacobson also stated that she did not see anything unusual or concerning in the video of the nursing staff cleaning A.A. on a mat. She did not see any hospital staff drop or mishandle A.A. Additionally, Dr. Jacobson did not see anything that would cause the amount of force necessary to result in the crushing of A.A.'s skull. Moreover, Dr. Jacobson testified that she did not see anything unusual in the photographs consistent with the findings seen in the CT or MRI scans.

Dr. Jacobson testified that although rare, it was possible for an infant to suffer skull fractures during birth. However, such fractures are simple fractures, not complex ones like A.A.'s. The simple fractures are usually asymptomatic and heal without any symptoms. Moreover, if the simple fractures cause symptoms in a baby, it would happen when the injury first occurred. Symptoms could be low Apgar scores. Here, A.A. did not have any symptoms at birth and had normal Apgar scores.

Dr. Jacobson was unable to determine a specific date as to when A.A. suffered her injuries. She, however, noted that encephalomalacia is a more chronic finding and in infants, it can be one and a half to two weeks. Here, on the head CT scan, there was scalp swelling, which is one indicator that let her know that the swelling was more recent—a

week or so old.  She stated that skull bones are difficult to date because the bones do not heal by forming callouses.

On cross-examination, Dr. Jacobson testified that physicians at Loma Linda Hospital document daily progress or changes in a patient.  In the types of injuries A.A. suffered, the symptoms would have surfaced immediately after occurrence.  Symptoms could include feeding difficulties, seizure-like activity, and breathing issues.  Father did not disclose that he had dropped his cell phone on the child.  A.A.'s lab results indicated that she had anemia and elevated liver enzymes.  A.A.'s skull injures were not caused by jaundice and anemia.  Moreover, A.A.'s eye exam was normal.

Dr. Jacobson testified that she had never delivered a baby, but had assisted in deliveries as a medical student.  On June 18, 2022, she conducted a physical exam on A.A. and examined her during a follow-up visit while A.A. was in foster care.  Dr. Jacobson did not know how much force the doctor used while Mother was giving birth, but she did not notice anything unusual from the twisting of A.A.'s head during delivery.

Dr. Jacobson went on to state that encephalomalacia could be caused by infection or by trauma or the acceleration/deceleration forces, such as shaking.  With A.A.'s findings, the doctor stated that A.A. would have had immediate symptoms such as lethargy, discomfort, pain, irritability, and difficulty sleeping.  Medical professionals, as well as caregivers, should have noticed the symptoms.

As to the four-second birthing video, Dr. Jacobson testified that the video did not prove the delivery was rushed.  Moreover, she stated that dropping a cell phone on a baby's cheek was not a direct cause of A.A.'s injuries, but could be related.  She also

26

testified that A.A.'s skull fractures were not "due to birth injury." When asked, "So you're saying with absolute medical certainty it's not possible that the child suffered skull fractures during the birthing process," Dr. Jacobson stated: "I'm saying that it's very, very, very unlikely."

Upon questioning by the court, Dr. Jacobson testified that skull fractures of A.A.'s degree would cause pain to A.A. Although it was would be difficult to ascertain why an infant would be crying, they could "expect increased fussiness, crying, some type of symptoms."

After Dr. Jacobson was excused, counsel presented their arguments to the court. Thereafter, the juvenile found true all the section 300 petition allegations. The court found there was no explanation that would explain the complex fractures to A.A.'s skull. The evidence showed that A.A. was in the exclusive care of Parents from May 3 to June 17, except for about six hours when the MGPs cared for A.A. The court watched the videos and found that the alleged slamming did not happen. Moreover, the court did not see any indication that the obstetrician crushed A.A.'s skull while removing the umbilical cord from around A.A.'s neck. The court rejected Dr. Gabriel's testimony as unreasonable and unsupported by the evidence.

The court went on to state that the Department was not required to prove by clear and convincing evidence the "ID of the perpetrator." The court found that the evidence "strongly suggests that father is the one that committed by abuse of this child."

The court found that C.A. came within section 300, subdivisions (b)(1), and (j), and A.A. came within section 300 subdivisions (a), (b)(1), and (3). The court adjudged

the children dependents of the court, removed physical custody from Parents, and denied family services to Mother and Father under section 361.5, subdivision (b)(6). Thereafter, the court set a section 366.26 hearing, reduced Parents' supervised visitation to one time a week, and found that supporting reunification with Parents was not in the best interests of the children.

As to the bypass provision, the juvenile court stated that it had "identified the parents as the perpetrators." For Mother, the court found that mother failed "to take the appropriate action to protect the child when father [was] the perpetrator." The court stated that Mother "would have been aware of the injuries to the child in light of the fact that the expert testimony by Dr. Jacobson said there would have been immediate onset of symptomology for this child; that the time frame for the child being injured is consistent with the—that those injuries occurred after the last pediatric visitation or appointment; and that the child would have been in the sole care and custody of mother and father during that time period. [¶] And just the severe nature of these injuries—the skull fracture being complex and on both sides of the child's head, being consistent with the fact this child—these injuries are only seen in cases where the child is thrown during a rollover accident and whose head impacts with the ground or the road causing these level of injuries, this was not an accidental injury. This was inflicted. It was abusive. And the Court believes that father is the perpetrator of that, in that event."

On March 22, 2023, Mother filed a notice of intent to file writ petition; Father filed his writ petition notice on March 23, 2023.

28

**DISCUSSION**

A.    <u>THE JUVENILE COURT PROPERLY APPLIED SECTION 355.1 AND SUBSTANTIAL EVIDENCE SUPPORTS THE COURT'S JURISDICTIONAL FINDINGS</u>

Father contends that "the court erred when it applied section 355.1 because notice was not proper; yet, even if notice were proper, parents rebutted the presumption and thus there was not substantial evidence the [Department] met its burden."

1.    *LEGAL BACKGROUND*

Section 355.1, subdivision (a) provides: "(a) Where the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, the guardian, or other person who has the care or custody of the minor, that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300."

"Once the petitioner establishes a prima facie case under section 355.1 the burden of producing evidence 'shifts to the parents the obligation of raising an issue *as to the actual cause of the injury* or the fitness of the home.' [Citation.] 'The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine

29

the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption.' " (*In re D.P.* (2014) 225 Cal.App.4th 898, 905.)

### 2. *MOTHER AND FATHER HAD NOTICE*

In support of his argument that the Department failed to "disclose[] it sought application of Section 355.1," Father cites *In re G.Z.* (2022) 85 Cal.App.5th 857. *G.Z.* does not support Father's argument. In *G.Z.*, the agency "never plead, alleged, or argued the provisions of section 355.1 nor notified it would rely on its provisions." (*Id.* at p. 884.)

Unlike *G.Z.*, the section 300 allegations in this case borrowed language from section 355.1; the petitions alleged that "[w]hile in the care and custody of the mother and father, the child . . . has been physically abused," and that the child's sibling "has been abused and/or neglected as defined by W&IC 300(a) and (e)." These "allegations adequately gave [both parents] notice that the Department was relying, at least in part, on the presumption created by section 355.1." (*In re D.P.*, *supra*, 225 Cal.App.5th at p. 905.)

In support of this notice given to Parents, at the contested jurisdictional hearing on March 15, 2023, Mother's counsel acknowledged that the Department was relying on section 355.1: "County has alleged that 355.1 applies in this case in that the County believes that the injuries sustained by the child [A.A.] would not have occurred but for unreasonable or neglectful acts of Parents." Thereafter, Mother's counsel argued why section 355.1 should not be applied. After Mother's counsel concluded her argument, Father's counsel joined with Mother's section 355.1 argument: "On behalf of Father, in

30

order to—in the spirit of judicial sufficiency, I'll simply join in the majority of [Mother's counsel's] arguments, specifically as to the 355.1 argument . . . . I believe these parents are similarly situated in that regard, so I won't waste valuable court time reiterating those arguments; but I do believe that the same arguments apply to Father." County counsel, in its closing argument, also mentioned the application of section 355.1.

Based on the above, we find that Parents were given adequate notice.

### 3. *SUBSTANTIAL EVIDENCE SUPPORTS THE COURT'S FINDING*

Father argues that, even if notice were proper, "the court erred when it failed to find the parents rebutted the presumption in Section 355.1 . . . . [O]nce Dr. Gabriel's testimony provided the quantum of evidence required to rebut the presumption in Section 355.1, it was the Agency's burden to prove those facts. The only evidence before the court supporting the Agency's theory was Mother's testimony Father dopped his cell phone on A.A.'s cheek, leaving a 'little bruise' [citation], which Dr. Gabriel testified could not have caused the injuries unless it affected both sides of A.A.'s head." For the reasons set forth *post*, we find that substantial evidence supports the court's finding.

In reviewing a challenge to the sufficiency of the evidence supporting jurisdictional findings and related dispositional orders, we " 'consider the entire record to determine whether substantial evidence supports the juvenile court's findings.' " (*In re G.Z.*, *supra*, 85 Cal.App.5th at p. 876; see also, *In re I.J.* (2013) 56 Cal.4th 766, 773.) "Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.)

Under the substantial evidence standard "we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders." (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688-689.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." (*In re Matthew S.* (1988) 201 Cal.App.3rd 315, 321.) " ' [T]he trial court's ruling must be upheld if there is any basis in the record to sustain it.' " (*In re J.E.* (2020) 54 Cal.App.5th 309, 313-314, quoting *People v. Marquez* (1992) 1 Cal.4th 553, 578.)

In this case, Father argues that "Dr. Gabriel's testimony provided the quantum of evidence required to rebut the presumption in Section 355.1." However, the juvenile court did not find Dr. Gabriel to be credible and "reject[ed] Dr. Gabriel's testimony as unreasonable and unsupported by the evidence." Therefore, Parents failed to provide substantial evidence to rebut the presumption of section 355.1.

In support of his argument, Father also relies on *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036 (*Esmeralda B.*). The case, however, does not support Father's argument.

In *Esmeralda B.*, the social worker "was examined concerning her report, which was received in evidence." (*Esmeralda B.*, *supra*, 11 Cal.App.5th at p. 1039. The social worker investigated the incident by interviewing the minor and members of the minor's family. "[S]he stated that her investigation of Esmeralda and her family *made her believe there was nothing the parents should have done to prevent the injury from happening. Further, she believed the parents would act appropriately to prevent such an incident*

32

*from happening in the future and, most significantly, could not think of any action the parents had taken which was unreasonable or was neglectful to Esmeralda or her siblings*." (*Id.* at p. 1040.) At the conclusion of the hearing, "the court discussed the conflicting evidence concerning the physical cause of Esmeralda's injury, whether molest or accidental, and resolved it in favor of molest. However, the court did not point to any evidence supporting a finding the molest, if it occurred, resulted from the parents' failure or inability to adequately supervise or protect her. Nor did the court make any such finding, instead concluding 'that [Esmeralda] needs the protection of the juvenile court because of the actions of the parents subsequent to the injures.' " (*Id.* at p. 1043, fn. omitted.) Therefore, the reviewing court found that "[t]here is no substantial support for this conclusion." (*Ibid.*)

The facts in this care are distinguishable from the facts in *Esmeralda B.* Unlike the social worker's report in *Esmeralda B.*, the reports submitted in this case found evidence of abuse and neglect by Parents. The social worker reported that A.A. suffered significant multiple and serious injuries while she was in Parents' care. Although numerous doctors determined A.A.'s injuries to be non-accidental trauma, Parents failed to provide an adequate explanation as to how A.A. sustained the injuries. Moreover, when making its finding, the juvenile court thoroughly discussed its reasons for making its finding and reiterated the evidence supporting that the abuse resulted from Parents' failure to protect.

Furthermore, Father appears to be arguing that "[t]he only evidence before the court supporting the Agency's theory was Mother's testimony Father dopped his cell

33

phone on A.A.'s cheek, leaving a 'little bruise' [citation], which Dr. Gabriel testified could not have caused the injuries unless it affected both sides of A.A.'s head." Father's argument is without merit.

As discussed in detail *ante*, medical records and numerous doctors provided information that A.A. suffered multiple skull fractures while she was in Parents' care. Moreover, the fractures were consistent with abusive head trauma, caused by blunt force with acceleration-deceleration forces. With regard to Dr. Gabriel's testimony, as noted above, the juvenile court did not find him to be credible. The court noted, "[i]n evaluating the experts' opinions, I looked at their knowledge, skill, experiences, training and education, the reasons the experts gave for their opinions, and any facts or information on which the experts relied in reaching their opinions."

The court then stated: "And I'm going to start with Dr. Gabriel. Because at first impressions, after looking at his CV, you would believe that he would be an expert on which the Court could rely. And the fact that he is a court-appointed expert either in Orange County or Los Angeles—I forgot which one right now—adds to his credibility. His expertise in his field of study of pediatric neurology, top notch. And upon first reading of his report, one would reasonably think, 'Hmm, there's something here. This is a problem for the Department in establishing jurisdiction over . . . these children.' [¶] And I refer to Dr. Gabriel's report. It's been marked as Court's Exhibit 7."

The court then described Dr. Gabriel's report and the language he used. The court pointed out the doctor's language describing the four-second video as showing "both urgency and panic in delivering this child." The juvenile court then went on and stated,

34

"[w]hen I first read that, I could only imagine what Dr. Gabriel described as 'urgent' and panic.' And he testified in court, under oath, that undoubtedly he saw panic in that delivery doctor's actions just by looking at the hands in that four-second video."

The court also described page three of Dr. Gabriel's report that "the skull fractures resulted in linear on the left parietal plate and complex on the right parietal plate, the lateral location where [A.A.'s] head slammed on the mat.' And again in court, Dr. Gabriel used the word 'slammed' in his testimony. Once again, the Court was very concerned that such actions occurred during the birth of this child based on the doctor's representations in his report.

Thereafter, the court stated: "And then I watched the videos. And I've watched them ten-plus times. I watched them after the doctor testified. I watched them a couple of days ago, during the closing arguments, the first day of closing arguments. And Dr. Gabriel's representation in his reports, nowhere, in no way, are based on reality. There is no indication [in] the reports that the doctor, while attempting to remove the umbilical cord around [A.A.'s] head, crushed that baby's skull. Not one indication that this Court can see. [¶] . . . [¶] I then watched the video about the nurses cleaning the child and when the head supposedly, quote, unquote, was slammed onto a table. It simply didn't happen. It's not true."

"So when I look at the testimony of Dr. Gabriel, which should have been very helpful to this Court—and my frustration with Dr. Gabriel, if it came out in my questioning of him or during his questioning by counsel, is because I could have seen myself believing his testimony and wanting to believe that it was true. But the fact that

35

he stepped out of his role as an expert and, in this Court's opinion, became an advocate for a certain position, disqualified him as a credible witness. And so I reject Dr. Gabriel's testimony as unreasonable and unsupported by the evidence."

Based on the evidence provided in detail *ante*, and the court's finding that Dr. Gabriel was not a credible witness and rejected his testimony, we find that the court's jurisdictional findings are supported by substantial evidence.

> B.      <u>SUBSTANTIAL EVIDENCE SUPPORTS A FINDING OF A CAUSAL LINK OF A.A.'S INJURIES TO PARENTS' ACTIONS AND CONDUCT</u>

Father contends that "because there was no substantial evidence linking the parents to A.A.'s injuries, the court abused its discretion in finding A.A. came within section 300[, subdivision (e)]."

Section 300 states that "[a] child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:  [¶] . . . [¶]  (e) The child is under five years of age and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child.  For the purposes of this subdivision, 'severe physical abuse' means any of the following: any single act of abuse that causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death; . . . or more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, bone

fracture, or unconsciousness; or the willful, prolonged failure to provide adequate food." (§ 300, subd. (e).)

In this case, after a contested jurisdictional hearing, the juvenile found "by a preponderance of the evidence, the allegations, a-1, b-1, e-1 and j-1, in the petition, filed on 06/28/2022 is/are true." Therefore, the court found that A.A. "comes within Section 300(a), (b)(1), and (e) Welfare and Institutions Code.

When making this finding, the court stated as follows:

"As to the specific allegations in this case, the Court has reviewed, prior to today, the case of *Robert C.*, 219 Cal.App.4th 1241; the case of *In re E.H.*, 108 Cal.App.4th 659; and the case of *In re A.S.*, 202 Cal.App.4th 237.

"The Court found helpful the language in those cases that section 300(e) does not require the parents actual or constructive knowledge that the child, in fact, suffered severe physical abuse; and . . . severe injuries listed in the section, such as bleeding, internal bleeding, internal swelling, or broken bones may not be visible; and that they may be discovered only after a medical examination or testing [t]he question then should be the parents have reasonably known that the child had been abused.

"The Department is not required to prove by clear and convincing evidence the ID of the perpetrator. That will be left to the criminal courts. I have not used the fact that a criminal complaint has been filed against the parents in this case as evidence of anything in this case. As I have told juries for years and years and years, the fact that a criminal case has been filed against a criminal defendant is not proof of anything. And it's certainly not proof here.

"The purpose of this Court, as opposed to—the criminal courts is identifying the perpetrator or punishing the perpetrator if found guilty beyond a reasonable doubt. The purpose of this Court is to make orders that are in the best interest of the child, which sometimes include removing the child from the home and denying family reunification services. The Court must determine whether the record viewed as a whole contained substantial evidence from which a reasonable trier of fact could make findings by clear and convincing evidence.

"The Court recognized that it is my role to assess the credibility of various witnesses and to weigh the evidence to resolve the conflicts in the evidence.

"Having expressed my concerns about Dr. Gabriel, the evidence supports a finding that the injuries in this case were inflicted intentionally. And there's been no argument to the contrary."

Thereafter, the court admitted reports into evidence, ruled on ICWA, and discussed other procedural matters in this case. The court then returned to its section 300 finding, and stated:

"The Court would like to make a little further record as to why I believe that the parents and the evidence strongly suggests that father is the one that committed the abuse on this child.

"Mother testified that father was a primary caregiver of the child after they were released from the hospital following the birth of the child; that there were many times when he was not caring for the children as they had agreed to. The mother was . . . for

38

many days recovering from the surgery, the C-section. The father was home from work on paternity leave and was primarily responsible for caring for the children—"

At this time, Mother's counsel stated: "Your Honor, I'm sorry to interrupt the Court. But [A.A.] was born vaginally, as shown in the video."

The court then responded:

"You're right. I'm sorry. Strike the C-section.

"—following the child's birth; that this was a situation in which mother and father were experiencing significant marital discord; that mother testified that she repeatedly kept pushing for divorce from the father; and that she expressed great frustration with the father's parenting.

"The Court would also note that after the significant injuries were discovered by the medical professionals, it was only then that father admitted to having caused bruising to the child's face, to her cheek, and shared that with mother; that Dr. Jacobson testified that a bruise to the fleshy part of the cheek to an infant who was not ambulatory and able to cause that bruise by his or her own actions is extremely concerning in her role as a child abuse expert. I would also note the Court thought it was important to note that besides the injuries seen on the CT scans and the MRIs of the brain injuries and the fractures to the child's skull on both sides of her head, that there was also swelling to the child's scalp. And it was Dr. Jacobson's informed opinion that the injuries occurred sometime prior to ten to 14 days. The Court did take into consideration, based off cross-examination, that those injuries could have occurred up to 56 days prior, but that was not her expert opinion.

39

"The Court would also note that in weighing the expert's opinion, Dr. Gabriel, as was mentioned by counsel, did not see the child, did not examine the child, did not speak with the parents, and did not consult with any other doctors. And in this case, the Court found it significant that Dr. Jacobson did consult with other pediatric specialists, including neurologists, ophthalmologists, radiologists in forming her opinion.

"By a preponderance of the evidence, the allegations (a)(1), (b)(1), (b)(2), (e)(1), and (j)(1) in the petition filed on June 28th are true. The petition is sustained, and the children are persons described under section 300(b)(1). As to [C.C.], [he] is also a child as described under section 300(j); and that [A.A.] is a person described under sections 300(a), (b)(1), and (e)."

Based on the evidence presented in the reports filed with the court and testimony during the hearing, we find that the court's finding is supported by substantial evidence.

Father's reliance on *In re Roberto C.* (2012) 209 Cal.App.4th 1241 (*Roberto C.*) is misplaced. In *Roberto C.*, the reviewing court affirmed the juvenile court's finding that no evidence linked Parents to the child's injuries. (*Id.* at p. 1254.) There, the child was in daycare every day during the work week for three weeks prior to his hospitalization, and the parents and the babysitter did not have a suitable explanation for the child's injuries. (*Id.* at pp. 1245, 1247.) One of the doctors opined that the child's injuries were nonaccidental while another doctor was unable to come to the same conclusion. (*Id.* at pp. 1247-1248.) The lower court found that there was no evidence linking the parents to the infliction of the injuries. (*Id.* at p. 1254.) The appellate court held that the "facts contained in this record do not create a level of certainty concerning the parents'

40

knowledge sufficient to find an abuse of discretion by the juvenile court." (*Id.* at p. 1256.)

Father contends that this case is similar to *Roberto C.* because "the court relied heavily on the testimony of Dr. Jacobson in drawing the inference that Father caused A.A.'s injuries, where the only evidence Father caused any harm to A.A. was by accidentally dropping a cell phone on her cheek, [citation] which Dr. Gabriel testified could not have caused skull fractures on both sides of A.A.'s head." Father goes on to state that "the court should not have relied on Dr. Jacobson's testimony to fill the gap in the record, which lacked substantial evidence to causally connect the parents to A.A.'s injuries."

First, we do not find *Roberto C.* persuasive in light of the deferential standard of review we must apply. In *Roberto C.*, applying the substantial evidence standard of review and giving the juvenile court deference, the court found that "the conclusion of the juvenile court that there was no evidence that the parents knew or should have known of the abuse is supported by substantial evidence." (*Roberto C.*, *supra*, 209 Cal.App.5th at p. 1256, fn. omitted.) Thereafter the court found no abuse of discretion. (*Ibid.*)

Like the court in *Roberto C.*, we must give deference to the lower court's decision. We note we must uphold an order if it is supported by substantial evidence, even when substantial evidence to the contrary also exists. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) Here, because we find the juvenile court's ruling under section 300 was supported by substantial evidence, we must affirm the court's assumption of jurisdiction.

41

While the juvenile court in *Roberto C.* found no evidence linking the injuries to Parents. The juvenile court in this case expressly found causation linking A.A.'s injuries to Parents' actions or omissions. A.A. was not ambulatory and, unlike the case where the child went to day care in *Roberto C.*, A.A.'s parents exclusively cared for A.A. Moreover, there is more than ample evidence to indicate that the numerous skull fractures and injuries to A.A. were caused by non-accidental trauma. This finding was supported by substantial evidence as the injuries to A.A. occurred only while she was under the care of Parents and MGM.

Moreover, the juvenile court in this case properly relied on *In re E.H.* (2003) 108 Cal.App.4th 659. In *E.H.*, an infant suffered from numerous fractures. The parents denied that they or other people in the home caused the injuries. Substantial evidence, however, supported that the parents should have known the child was being abused when the child was never out of the parents' custody, and remained with a family member at all times. (*Id.* at pp. 662, 670.) The only reasonable conclusion was that the parents reasonably should have known that the child was being harmed by someone in the house. In *E.H.*, the court stated that the statute does not require actual knowledge of the abuse; where there is no identifiable perpetrator, a finding may be supported by circumstantial evidence. (*Id.* at pp. 667-670.)

Here, just like the facts in *In re E.H.*, A.A. was always in the custody of Parents except for the six hours she was under MGP's care. The only reasonable conclusion is that Parents should have known that A.A. was being harmed because of her symptoms, and the injuries were caused by those who cared for her. Based on the plethora of

evidence regarding A.A.'s injuries cited in detail *ante*—in the Department's reports, medical records, and testimony during the hearing—substantial evidence supports the finding by the juvenile court of a causal link of A.A.'s injuries to parents' actions and conduct. Therefore, the court did not abuse its discretion in finding that section 300 applied to both A.A. and C.A.

    C.    <u>THE BYPASS OF REUNIFICATION SERVICES TO PARENTS IS</u>

                    <u>SUPPORTED BY SUBSTANTIAL EVIDENCE</u>

Both Mother and Father argue that the trial court abused its discretion when it denied them reunification services under section 361.5, subdivision (b)(6).

Generally, the juvenile court is required to provide reunification services to a child and the child's parents when a child is removed from parental custody under the dependency laws. (§ 361.5, subd. (a).) The purpose of providing reunification services is to "eliminate the conditions leading to loss of custody and facilitate reunification of parent and child. This furthers the goal of preservation of family, whenever possible." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478.) It is also the legislative intent, "that the dependency process proceed with deliberate speed and without undue delay." (*Marlene M. v. Superior Court* (2000) 80 Cal.App.4th 1139, 1151.) "Thus, the statutory scheme recognizes that there are cases in which the delay attributable to the provision of reunification services would be more detrimental to the minor than discounting the competing goal of family preservation. [Citation.] Specifically, section 361.5. subdivision (b), exempts from reunification services 'those parents who are unlikely to

43

benefit' from such services or for whom reunification efforts are likely to be 'fruitless.' "

(*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1120.)

Specifically, section 361.5, subdivision (b)(6), provides that a court may deny services if there is clear and convincing evidence: "That the child has been adjudicated a dependent pursuant to any subdivision of section 300 as a result of . . . the infliction of severe physical harm to the child . . . by a parent or guardian, as defined in this subdivision, and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian."

When the juvenile court concludes reunification efforts should not be provided, it " ' "fast-tracks" ' " the dependent minor to permanency planning so that permanent out-of-home placement can be arranged. (*Jennifer S. v. Superior Court*, *supra*, 15 Cal.App.5th at p. 1121.) The statutory sections authorizing denial of reunification services are commonly referred to as " 'bypass' provisions." (*Ibid*.)

Once it has been determined one of the situations enumerated in section 361.5, subdivision (b), applies, " ' " the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources." ' " (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227; accord, *In re A.G.* (2012) 207 Cal.App.4th 276, 281.) Thus, if the juvenile court finds a provision of section 361.5, subdivision (b), applies, the court "shall not order reunification for [the] parent. . . unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c)(2).) "The burden is on the parent to . . . show

44

that reunification would serve the best interests of the child." (*William B.*, at p. 1227; accord, *A.G.*, at p. 281.)

"We affirm an order denying reunification services if the order is supported by substantial evidence." (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 839; see also *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 971.) In applying the substantial evidence test, we presume the court made the proper order and consider the evidence in the light most favorable to the ruling. (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010 fn.7.) We do not "resolve conflicts in the evidence, pass on the credibility of the witnesses, or determine where the preponderance of the evidence lies. [We merely determine whether] there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact." (*In re Walter E.* (1992) 13 Cal.App.4th 125, 139-140.)

Mother argues that substantial evidence does not support the court's finding that Mother was a perpetrator of abuse to A.A. She states that the court failed to articulate facts that support Mother had knowledge about Father's abuse of A.A.

In support of her contention, Mother relies on *Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 849 (*Tyrone W.*). In that case, after an infant died of sudden infant death syndrome, the medical examiner discovered that the infant suffered from several two-week-old rib fractures that were deemed suspicious and were " 'likely indicative of child abuse.' " (*Id.* at p. 844.) After the infant's sibling was found to be a child described by section 300, subdivisions (b) and (j), the juvenile court denied reunification

45

services to the parents pursuant to section 361.5, subdivision (b)(6). (*Tyrone W.*, at p. 845.)

In reversing the juvenile court's order denying reunification services, the appellate court noted that the deceased infant's "injuries, although severe, were not obvious. There was no bruising or other marks on [the infant] and no reports that [the infant] had been in distress." (*Tyrone W.*, *supra*, 151 Cal.App.4th p. 852.) The court also stated that there was no evidence to show that, if one parent had inflicted injury on the infant, the other parent knew about it. (*Ibid.*) The appellate court stated: "We do not believe section 361.5, subdivision (b)(6) applies to a parent who 'reasonably should have known' of the abuse because that parent was not complicit in the infliction of physical harm by act, omission or consent. As defined in subdivision (b)(6), omission and consent both require actual knowledge, if not of the physical harm itself, then of another's abusive acts. We hold that subdivision (b)(6) applies to the parent or parents who inflicted severe physical harm to the child whether by act, omission or consent, and does not apply to a negligent parent." (*Id.* at 851.) The court further held that "where there is no evidence to show both parents knew the child was abused or injured, the court must identify the parent who inflicted the child's injuries before denying reunification services to that parent." (*Id.* at p. 852.) The court, however, expressly commented that it did "not quarrel with the proposition that when the child's injury or injuries were obvious to the child's caretakers and they failed to act, the court is not required to identify which parent inflicted the abuse by act and which parent inflicted the abuse by omission or consent. In such a case, the

evidence supports a conclusion that both parents knew the child was injured or being abused." (*Ibid.*)

In this case, unlike *Tyrone W.*, *supra*, there was substantial evidence to support that A.A.'s "injury or injuries were obvious to the child's caretakers [, Mother and Father,] and they failed to act." (*Tyrone W.*, *supra*, 151 Cal.App.4th 852.)

As discussed *ante*, at the contested jurisdiction hearing, the juvenile court found that "there is clear and convincing evidence the parents are persons described under 361.5 (b)(6). Therefore, reunification services will be denied, finding that the services are not in the best interest of the children." Later, the court reiterated that "[u]nder the bypass, I have identified *the parents* as the perpetrators." When Mother's counsel asked for findings specifically with respect to Mother, the court stated:

"In light of the fact that mother failed to take the appropriate action to protect the child when father is the perpetrator, in the Court's eyes; that she . . . would have been aware of the injuries to the child in light of the fact that the expert testimony by Dr. Jacobson said there would have been immediate onset of symptomology for this child; that the time frame for the child being injured is consistent with the—that those injuries occurred after the last pediatric visitation or appointment; and that the child would have been in the sole care and custody of mother and father during that time period.

"And just the severe nature of these injuries—the skull fracture being complex and on both sides of the child's head, being consistent with the fact this child—these injuries are only seen in cases where the child is thrown during a rollover accident and whose head impacts with the ground or the road causing these level of injuries, this was not an

47

accidental injury. This was inflicted. It was abusive. And the Court believes that father is the perpetrator of that, in that event."

Mother, however, argues that there was no factual statement by the court to support Mother was aware of the abuse while Father argues that there was no evidence that he intentionally caused injury to A.A. We find Parents' arguments to be without merit.

As discussed *ante*, Dr. Jacobson testified that with A.A.'s injuries, A.A. would have had immediate symptoms such as lethargy, discomfort, pain, irritability and difficulty sleeping. Although Mother contends that such symptoms are commonplace, Dr. Jacobson testified that A.A.'s caregivers should have noticed these symptoms. Hence, it can be deduced that the kind of pain A.A. had to endure from her skull fractures would have caused significantly greater symptoms than that of other infants with similar symptoms.

In applying the substantial evidence test on appeal, we presume the juvenile court made the proper order when considering the evidence in the light most favorable to the ruling. (*Sheila S. v. Superior Court*, *supra*, 84 Cal.App.4th at p. 880.) As a reviewing court, we do not "resolve conflicts in the evidence, pass on the credibility of the witnesses, or determine where the preponderance of the evidence lies. [We merely determine whether] there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact." (*In re Walter E.*, *supra*, 13 Cal.App.4th at pp. 139-140.)

Here, the juvenile court found both Mother and Father to be the perpetrators of the injuries to A.A. under section 361.5, subdivision (b)(6). The court relied on the voluminous medical records regarding A.A., and Dr. Jacobson's testimony, while rejecting Dr. Gabriel's expert opinion. With the rejection of the evidence provided by Dr. Gabriel, the court's implicit finding that Mother had either known that Father caused the injuries to A.A.—since he exclusively cared for A.A.—or that Mother was complicit by failing to act, is supported by substantial evidence.

Moreover, both parents rely on *J.J. v. Superior Court* (2002) 81 Cal.App.5th 447 (*J.J.*) in support of their contention that the juvenile court erred in bypassing reunification services. In *J.J.*, a young child was discovered to have skull fractures, contusions, and other bruises. (*Id.* at p. 451.) The father was home with the child when the child was injured. The mother was not home. (*Ibid.*) The father called the mother to report that the child was bleeding from above his eye. The mother told the father to call 911. The father, however, waited 30 minutes to do so. (*Id.* at p. 452.) The father gave various explanations that did not account for the injuries. (*Id.* at p. 454.) The older children reported that the father had physically disciplined them with a belt. (*Ibid.*) On the night in question, the mother stated that she had left the home after fighting with the father. (*Id.* at p. 452.) The court found the petitions true and that the father had inflicted the injuries. (*Id.* at p. 454.) The juvenile court then found the mother was also a perpetrator of the injuries because she knew or should have known it was dangerous to leave the children with the father. Moreover, when the mother became aware of the injuries, she did not return home immediately and did not summon medical assistance. (*Id.* at pp. 454-

49

455.)  The juvenile court, therefore, bypassed services to the mother under section 361.5, subdivisions (b)(5), (6) and (7).  (*J.J.*, at p. 455.)

The mother petitioned for writ review, and the court of appeal reversed the juvenile court's decision to bypass reunification services for the mother.  (*Ibid.*)  The court held that section 361.5, subdivision (b)(6), did not apply because there was no substantial evidence to support that the mother knew or should have known the father would inflict the injuries.  (*J.J.*, *supra*, 81 Cal.App.5th at pp. 458-460.)

The facts in this case are distinguishable from the facts in *J.J.*  Here, both Mother and Father were caring for A.A. when the injuries occurred.  Mother was not outside the home.  Additionally, A.A. had had been suffering serious pain and other symptoms, which both parents would have noticed, for two weeks prior to Parents seeking medical treatment.  Mother testified that A.A. was colicky, would cry randomly, was gassy, farting all the time, and clinched her fists at or above her ear level.  Mother also expressed concerns that A.A. was sleepy, grunted, and had difficulty feeding.  Unlike *J.J.*, A.A. had outward symptoms that both parents would have known about.

Based on the records the juvenile court relied on and the testimony given at the contested hearing, substantial evidence supports the juvenile court's denial of reunification services under section 361.5, subdivision (b)(6).

D.      <u>SUBSTANTIAL EVIDENCE SUPPORTS THE JUVENILE COURT'S</u>

              <u>FINDING THAT REUNIFICATION SERVICES WERE NOT IN THE</u>

              <u>CHILDREN'S BEST INTEREST</u>

Mother contends that the juvenile "court abused its discretion when it denied Mother reunification services because services were in the minors' best interests." Father contends that "the court erred when it denied the parents reunification services under section 361.5(b)(6) without making proper findings as required by section 361.5(k)." We disagree with both parents.

"[T]he party seeking bypass of reunification services under section 361.5, subdivision (b) has the burden of proving that reunification services need not be provided," a showing that must be made by clear and convincing evidence. (*In re Angelique C.* (2003) 113 Cal.App.4th 509, 519, 521, disapproved on another ground in *Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1010, fn. 7.) However, under section 361.5, subdivision (c)(2) "[t]he court shall not order reunification for a parent or guardian described in paragraph . . . (6) . . . of subdivision (b) unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c)(2).)

"A court called upon to determine whether reunification would be in the child's best interest may consider a parent's current efforts and fitness as well as the parent's history. [Citation.] Additional factors for the juvenile court to consider when determining whether a child's best interest will be served by pursuing reunification include: the gravity of the problem that led to the dependency; the strength of the relative

51

bonds between the child and both the parent and caretakers; and the child's need for stability and continuity, which is of paramount concern." (*In re S.B.* (2013) 222 Cal.App.4th 612, 622-623.)

"A juvenile court has broad discretion when determining whether . . . reunification services would be in the best interests of the child under section 361.5, subdivision (c). [Citation.] An appellate court will reverse that determination only if the juvenile court abuses its discretion." (*In re William B.*, *supra*, 163 Cal.App.4th at p. 1229.) In other words, we will not disturb such a discretionary decision unless the lower court made "an arbitrary, capricious, or patently absurd determination." (*Adoption of D.S.C.* (1979) 93 Cal.App.3d 14, 24-25.) Furthermore, when the party with the burden of proof (i.e., Father in this case) fails to meet his or her burden, upon appellate review the question "becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support [the] finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on another ground in *Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1003, fn. 7.) The same standards direct our review in a proceeding under California Rules of Court, rule 8.452.

Even given a liberal construction of his petition, as required by California Rules of Court, rule 8.452(a)(1), Mother has not met her burden.

In this case, more than substantial evidence supports the juvenile court's finding that A.A. suffered multiple, non-accidental skull fractures while in the sole care and

custody of Parents, and that the injuries were inflicted and abusive. Moreover, the evidence supports the court's finding that Parents were dilatory in seeking medical treatment of A.A. since the child had been suffering pain and other symptoms for several weeks. Furthermore, Parents were unwilling to disclose what happened to A.A.

This court's reasoning in *In re A.E.* (2019) 38 Cal.App.5th 1124 is instructive. There, the lower court sustained section 300, subdivisions (a), and (e), allegations, after the child sustained a subdural hematoma, among other head injuries. (*Id.* at p. 1128.) The lower court also found that by clear and convincing evidence, it was in the child's siblings' best interest to grant reunification services to both parents, even though section 361.5, subdivision (b)(6) bypass applied. (*Id.* at p. 1140.) The lower court based the finding on the parents being actively engaged in their services, though the court stated the challenge for the parents would be " 'understanding and acceptance of responsibility for what happened.' " (*Ibid.*) This court reversed, concluding the trial court abused its discretion in granting reunification services because the parents both continued to deny that they had ever abused the children or had even physically disciplined them, despite engaging in services. (*Id.* at pp. 1141-1142, 1144.) This court reasoned that the mother's explanation of the child sustaining the head injuries as a result of falling was contradicted by the medical expert, who had concluded that the injuries could not have been sustained by such a fall. (*Ibid.*) Despite the mother identifying appropriate disciplinary techniques and attending classes, the court found that neither of these showed that services would likely lead to better parenting skills or would prevent further abuse. (*Id.* at pp. 1143-1144.)

Here, as in *In re A.E.*, both parents continued to deny responsibility for A.A.'s injuries—even though they and MGPs alone cared for A.A. during the time period when A.A. was injured. Moreover, medical experts found no possible medical explanation for A.A.'s injuries other than abusive head trauma. Dr. Gabriel, who made a contrary finding, was deemed to be an unreliable expert by the juvenile court. On this record, substantial evidence supports the juvenile court's implied findings under section 361.5, subdivision (k).

Additionally, Father argues that "because the juvenile court did not specify the factual findings it used to determine reunification services would not benefit the children, the court abused its discretion." In support of his argument, Father cites *In re Rebekah R.* (1994) 27 Cal.App.4th 1649 (*Rebekah R.*). Moreover, during oral argument, relying on *Rebekah R.*, Father's counsel argued that, because the juvenile court erred by failing to make specific findings, this matter should be remanded for the court to make these specific findings. We disagree.

In *Rebekah R.*, 27 Cal.App.4th at page 1650, the court stated, "it appears the Legislature intended that the juvenile court make an express, on the record finding of . . . severe physical harm as a pre-condition to denying reunification under the subdivision, notwithstanding the existence of an earlier jurisdictional finding on the same subject."

Almost a decade after *Rebekah R.* was decided, a mother in *In re S.G.* (2003) 112 Cal.App.4th 1254, 1259 (*S.G.*), made an argument similar to Father's. The mother attacked "the no-services order because the court did not make an explicit, on-the-record findings." The mother, relying on *Rebekah R.*, argued "that without explicit findings, the

54

juvenile court could not properly rest its decision to deny services on section 361.5, subdivision (b)(6), and [the appellate court] must reverse." (*Id.* at pp. 1259-1260.)

The *S.G.* court noted that the mother's reliance on *Rebekah R.* was not only misplaced, but that the court would "further take this opportunity to clarify our opinion in *Rebekah R.*" (*S.G.*, *supra*, 112 Cal.App.4th at p. 1260.) The court noted that in *Rebekah R.*, the juvenile court denied services to the non-offending parent, the father, without specifying "on what statutory ground it was ruling. (*Rebekah R.*, *supra*, 27 Cal.App.4th at p. 1650[].) We reversed *because there was insufficient evidence to warrant the denial order* on the one arguably applicable ground, subdivision (b)(5) of section 361.5. (*Rebekah R.*, *supra*, 27 Cal.App.4th at pp. 1652-1656[].) While the court also failed to make specific factual findings for a denial under subdivision (b)(6) of section 361.5, we did not reverse on that ground. (*Rebekah R.*, *supra*, 27 Cal.App.4th at pp. 1651-1652[].) Thus, *Rebekah R.* does not stand and should not be read to stand for the proposition advocated by appellant, namely the failure to make findings necessary for a denial of services under section 361.5, subdivision (b)(6) mandates reversal." (*S.G.*, *supra*, 112 Cal.App.4th at p. 1260, italics added, fn. omitted.)

The court in *S.G.* went on to state: "We did not hold that absent explicit findings we could not uphold a denial under section 361.5, subdivision (b)(6). Indeed, in the next portion of our opinion, we reiterated the pertinent rule of appellate review, that is, we will infer a necessary finding provided the implicit finding is supported by substantial evidence." (*Rebekah R.*, *supra*, 27 Cal.App.4th at p. 1652[], citing *In re Jesse B.* (1992)

55

8 Cal.App.4th 845, 851[]; see also *In re Corienna G.* (1989) 213 Cal.App.3rd 73, 83-84[].)" (*S.G.*, *supra*, 112 Cal.App.4th at p. 1260.)

Here, although the juvenile court did not make an express finding under section 361.5, subdivision (k), we can "infer a necessary finding provided the implicit finding is supported by substantial evidence." (*S.G.*, *supra*, 112 Cal.App.4th at p. 1260.)

In this case, substantial evidence supports implied findings on this point. The juvenile court found that services were not in the best interest of the children after finding that (1) A.A. suffered multiple, non-accidental skull fractures while in the care and custody of Parents; (2) Parents delayed medical treatment for A.A. and let her suffer for several weeks; and (3) neither parent had provided a plausible explanation for how the injuries occurred and how they would prevent such injuries from occurring in the future. At the contested hearing, the social worker testified that visitation is not even beneficial to the children. Under these circumstances, providing services to Parents would prove to be fruitless. "The Legislature has recognized . . . 'that it may be fruitless to provide reunification services under certain circumstances' set forth in section 361.5, subdivision (b)." (*Raymond C. v. Superior Court* (1997) 55 Cal.App.4th 159, 163.) " ' " ' Once it is determined one of the situations outlined in [section 361.5] subdivision (b) applies, the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources." " ' " (*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 914.)

Substantial evidence supports the trial court's orders that it was in the children's best interest to deny Parents' reunification services. The trial court should be affirmed.

Because the Legislature has decided that parents who fall under section 361.5, subdivision (b), are unlikely to benefit from reunification services, the court properly gave priority to the children's interest in the timely establishment of a stable, permanent plan rather than family unification. Therefore, we find that the court's implied finding that it was not in the children's best interest to grant reunification services is supported by substantial evidence. (See, *S.G.*, *supra*, 112 Cal.App.4th at p. 1260.)

E.     <u>THE JUVENILE COURT DID NOT ABUSE ITS DISCRETION IN REDUCING MOTHER'S VISITATION</u>

Mother contends that "the court erred in reducing Mother's visitation" because she was not the offending parent.

" ' The power to regulate visits between dependent children and their parents rests with the juvenile court and its visitation orders will not be disturbed on appeal absent an abuse of discretion.' " (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1069.)

"Although '[v]isitation is an essential part of a reunification plan,' it 'is not integral to the overall plan when the parent is not participating in the reunification efforts.' " (*In re Korbin Z.* (2016) 3 Cal.App.5th 511, 517; see also *In re D.B.* (2013) 217 Cal.App.4th 1080, 1090 [the court's discretion over visitation is less constrained after reunification services are terminated, when the focus in "on permanency and stability for the child"].)

In this case, Mother argues the juvenile court failed to make a finding that visitation was detrimental. However, there was no need to make this finding since the

court only reduced Mother's visitation from twice a week to once a week. Detriment is a finding necessary when the court denies visitation. (§ 361.5, subd. (f).)

Here, at the contested jurisdictional hearing, the court denied reunification services and set a section 366.26 hearing to establish permanency for the children. In light of the court's denial of reunification services and the Department's concurrent plan of adoption for the children, we discern no abuse of discretion by the juvenile court in reducing Mother's visitation with the children.

## DISPOSITION

The writ petitions are denied. The stay order entered July 7, 2023, is LIFTED.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

McKINSTER
Acting P. J.

FIELDS
J.

58